**Kay AUSTEN, Plaintiff,**

v.

**STATE OF HAWAII, and University of Hawaii, Defendants.**

**Civ. No. 84–00414SPK.**

United States District Court, D. Hawaii.

March 8, 1991.

Susan M. Ichinose, Robert F. Miller, Miller & Ichinose, Honolulu, Hawaii, for plaintiff.

Gary Hynds, Deputy Atty. Gen., Warren Price, III, Atty. Gen. of Hawaii, Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Senior District Judge.

The following constitute the Findings of Fact and Conclusions of Law required by Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

Kay Austen was found to have become "permanently and totally disabled for work

as of January 19, 1987" by the decision of the Director, Disability Compensation Division, Department of Labor and Industrial Relations, State of Hawaii, rendered on May 11, 1990. (P457). The Director had previously rendered a decision on December 7, 1982 finding Kay Austen temporarily totally disabled for work as of January 1, 1981. (P297).

In finding that Kay Austen was temporarily totally disabled, the Director said: "... the records are replete with information that claimant [Kay Austen] worked under very stressful conditions; all of her dealings with her employer were strained; the medical reports clearly show that she complained of stress at work and the medical reports indicate that stress at work could result in the type of 'injury' which claimant said she suffered on January 1, 1981." In finding that Kay Austen was permanently totally disabled, the Director relied upon the medical opinions of Dr. Lampert, Dr. Kraft, and Dr. Enelow. The last named doctor was the medical expert for Kay Austen's employer, the University of Hawaii. All doctors agreed that Kay Austen's disability was real and not imagined and was related to the stressful environment in which she worked as a teacher in the Department of English at the University of Hawaii.

Kay Austen had suffered aches and pains in her neck after pitching seven or so innings at a softball game in April 1980. Treatment by Dr. Odegaard helped to reduce her pain and she survived the summer in relative comfort. With the beginning of the fall semester and increasingly thereafter, she began to have increased pain which she attributed to the stresses and strains of dealing with the university administration and especially with her department chairman, Professor Travis Summersgill. As a result, not only did her physical condition deteriorate but also her psychological condition.

Dr. Rene Tillich, a certified clinical psychologist, reported on August 4, 1981, that when he saw Kay Austen in February 1981

"she was a woman in great physical pain, psychological pain, and with a badly damaged self esteem." He concluded: "While I understand that the final judgment of the relative merits of Chairman Summersgill's [1] and Kay Austen's behavior in these matters must be finally reached through legal procedures, I can say with professional certainty that Kay Austen's experience of Chairman Summersgill's [2] behavior was a direct and major contributing factor to both her state of psychological anguish and to her physical condition. It is unusual for a case to be so clear cut." (P116).

Dr. Juris Bergmanis, a neurological surgeon, agreed: "While I concur completely with Doctor Tillich's evaluation of this complex situation, I consider her medical problems to be trivial in comparison to the other issues facing her and suspect that they might have cleared by now had they not been constantly reinforced by the job-related stresses. Unfortunately, both problems are firmly intertwined, feeding on and perpetuating each other." (P120).

Defendants' expert psychiatrist, Allen J. Enelow, M.D., wrote on April 26, 1989: "While the evidence is clear that her chairman did indeed harass her and comes across from all of the records that I reviewed as a petty tyrant who made marked efforts to control her and was angered by her Affirmative Action activities in attempting to better the working and pay conditions for faculty women, the rather self-injurious strong opposition to this person who held all the power indicated that this was not just a matter of her standards and moral values but was an inflexible and neurotic continuation of the struggle against the authoritarianism of her father. This type of myopic and self-injurious inflexible behavior is characteristic of an individual with a personality disorder...." (P163 page 23).

The insensitive, unsympathetic, and even hostile treatment to which Kay Austen has been subjected by Department Chairman Travis Summersgill and other University of

---

1. Misspelled "Summerskill" in Dr. Tillich's letter.

2. Misspelled "Summerskill" in Dr. Tillich's letter.

Hawaii administration officials fully support the conclusions reached by the doctors.

In connection with her difficulties at and with the University of Hawaii, Kay Austen had filed Workers' Compensation claims under the State of Hawaii Workers' Compensation laws, grievances under the union contract between the University of Hawaii Professional Assembly and the University of Hawaii, complaints with the Equal Employment Opportunity Commission, and this lawsuit.

The union grievances went to arbitration. The decision of the arbitrator, Ted T. Tsukiyama, rendered on February 15, 1983, referred to the University's sick leave practice as "dependent upon a relationship of credibility, trust and cooperation between the chairman and faculty and a benevolent, solicitous concern on the part of the department chairman to effectuate the arrangement." He went on to observe: "This case is unique because no such benign, trusting and caring relationship existed between Department Chairman and Grievant here. To the contrary, the chairman/faculty relationship here was characterized by a mutual visceral dislike and repulsion toward each other. The Chairman regarded Grievant as a malingerer and questioned the authenticity of her disability. Grievant regarded her Chairman as a relentless persecutor who filled her with pathological fear." (D279).

The EEOC made a determination on September 3, 1983, that "there is reasonable cause to believe that the charge [retaliation and discrimination] is true" (P280) and issued a Right to Sue Letter on January 24, 1984 (P285).

During the grievance procedure, a three-person committee was appointed to advise the chancellor as to what should be done about the grievances. Thomas Q. Gilson, Joseph Maltby, and Loretta Krause conferred with Howard McKaughan and gave him their recommendations.

Thomas Q. Gilson testified in deposition: "As a result of reviewing the materials that were provided, I concluded that Dr. Summersgill was making an effort to have Mrs. Austen toe the line as a professor, and that he appeared to be using each requirement and opportunity to see that she did meet the requirements of the departmental position. I felt that his behavior was somewhat blameworthy in terms of aggravating the situation. I also reviewed the record as far as Mrs. Austen was concerned, and I felt that her behavior left a lot to be desired. And it was my recommendation that this matter should be settled rather than formalized as a grievance and taken to arbitration." (D10 v II pages 544–5).

Professor Travis Summersgill documented his hostility toward Kay Austen in numerous letters and memoranda. His early productions were relatively low-key.

Kay Austen, then Kay Lanier, had applied for tenure in late 1976. The department's Personnel Committee had voted 8 to 1 in favor of granting her tenure. Professor Travis Summersgill, as chairman, succeeded in having that application blocked. His Chairman's Assessment (P16) is couched in terms of concerned uncertainty but implies a negative conclusion. Early indications of future difficulties can be read into his statements that "I think I should know" whether "Kay will in the future be difficult or intransigent when it comes to any duty beyond the routine", that advancing her "too fast, too far, too soon" would not be "for her ultimate good" as well as the Department's, and that he "would prefer to make the case at its highest level" although "I have deliberately omitted all specific evidence" even though "[t]here is some and it can be supplied."

By January 17, 1981, Professor Summersgill was openly antagonistic. His registered letter to Kay Austen (P68) reads like the bill of particulars of a legal charge and ends with a threat of loss of pay. Apparently he did not appreciate the appearance of acting in the triple capacity of prosecutor, judge, and executioner. His letter in full reads as follows:

January 17, 1981

Assistant Professor Kay Austen

49–779 Kamehameha Hwy

Kaaawa, 96789

Dear Kay:

I returned to my desk after lunch yesterday to find two papers which you had left there. One was a "To Whom It May Concern" notice from Dr. Barry Odegaard, of the Ala Moana Medical Clinic, Inc. It read as follows:

This is to certify that <u>Dr. Kay Austen</u> has been under my care from <u>1/9/81</u> to <u>1/16/81</u>. <u>She</u> is able to return to work on—Indefinite——under care for cervical disc disease. [Underlined portions were in the physician's handwriting.]

The second item consisted of a letter from Sid, which read as follows:

Since Kay appears to be incapacitated for the semester, I should very much appreciate being assigned to her 1:30—2:45 Eng 255 section instead of the 253.

Thanks very much.

From the second note, I assume that you and Sid feel that the physician's note confers upon you a semester of leave with pay for a legitimate illness.

Please let me correct that impression.

In the University of Hawaii at the present time illness is handled in a relatively informal way which has worked well among congenial colleagues. One's friends take over one's courses when one is sick, and continue to do so until recovery. There is no automatic sick leave nor is there, as far as I have heard during my time here, any other mode of dealing with illness extending over a length of time.

Obviously, if you are ill, the Department and University will do what it can to help you out in every way possible. Your friends may, of course, volunteer to take over your classes, as they always have in every other serious case of illness.

But there are a number of reasons which make me doubtful about the seriousness and the duration of your claimed disability. These are as follows:

(1) I have rather detailed documentation of your performance during the last semester. It demonstrates to me that your major concern throughout the term has been to cut your work at the University to an absolute minimum. You arrived back late, and had your pay docked for the tardiness (you were, by the way, the only member of the English Department who did not either arrive back on time or request an extension of the arrival time for adequate cause). Although you were returning from a full year of sabbatical leave, you never bothered to submit the required report to the Dean of your activities during the sabbatical leave. Once classes started, you adhered rigorously to a two-day-a-week schedule, and, to wedge all your university duties within that scant amount of time, have frequently been unable to get handouts and tests done on time so that students have had to come to the departmental office after class to pick up assignment sheets of various sorts (sometimes, even when they came by late in the day, the promised handouts were still not available); you sought to utilize the duplicating facilities of another department without permission simply because it was more convenient to you than using those of your own department and so saved you time (and, when this was pointed out to you as improper, you sent a snide and sarcastic apology to the chairman of the other department); you resigned from an important committee (after trying to get all the other members to resign with you for ideological reasons which, since they refused to resign, I assume they found as unconvincing as I did) and I have long been convinced that your resignation from the committee was motivated by your unswerving intention of spending no more time at the University than was absolutely necessary; you avoided your own department as much as humanly possible, even going to the extreme to holding your office hours in the EWC Cafeteria (and refusing to do otherwise in the face of my written request that you hold your office hours in your office); and, although you are designated as a student adviser at registration, you neither came to your office to take care of your students nor did you call in to explain why you had not come in. As far

as I have been able to tell, you simply stayed away from the University from the exam period in mid-December until the problem of your class assignments arose on January 14.

Your behavior, as I see it, has been self-serving, asocial, arrogant, and uncollegial.

(2) On the afternoon of January 14, it became evident that neither your Victorian Lit class nor Sid's class in Chaucer had signed up more than three people. Following established procedure, I cancelled both, reassigned you to other classes, and called you to tell you of the change. In so doing, I was following standard procedure, since no undergraduate advanced class registering only three students after completion of the registration of juniors and seniors could possibly hope to approach the desired minimum of ten students. Sid answered the phone and learned of the change in his courses. I then asked for you. He said you were taking a shower and would call back. You did call back, but you asked for the assistant chairman, and not for me. When the secretary mentioned that, although the assistant chairman was not present, I was, you replied, "I'm not ready to talk to him yet." Presumably you were not ready to talk to me until the following afternoon. In the meantime, you had called the assistant chairman, and listed difficulties (the length of the commuting trip was the essential problem; there was no mention of any illness), and suggested (1) that a lecturer take the MWF course, (2) that your husband take your place even though this would give him three preparations and the very five-day week which you find unsatisfactory, and (3) that the department chairman might be guilty of harrassment.

When it became clear to you that Assistant Chairman Nicholson would make no changes before you had consulted me, you hung up. Five minutes later you called up the secretary to say that it was not a matter of convenience, but of health. For the first time you mentioned your illness.

Finally, at 1:45, you called me. It was the first time we had spoken to each other all semester except for a passing sentence in the first meeting of the Search Committee you so disapproved of. When you mentioned your physical disability, I demanded a physician's written statement confirming that it would be physically harmful to you to make the five-day trip from Kaaawa each week. Also, I said that the University very probably would wish to have its own physician examine you. You consented verbally to both conditions.

It was on the next day that I found your and Sid's notes on my desk when I returned from lunch. At that time (1:30 P.M) the secretary announced that you had called in and requested the Workmen's Compensation forms. They were duly sent. From then on throughout the afternoon I had the secretary call your house at periodic intervals, and there was no answer. Hence this letter.

I have reviewed your case in detail in order to show it to you as I see it. I feel that for the first semester after your sabbatical you performed the absolute minimum of work at the University which you could do and still hold your tenured job. When increased demands were made on you at the beginning of this second semester, you suddenly, on July 15, announced a physical disability, and the next day went to the doctor to have it confirmed. As a result of his medical opinion, you appear (if I read Sid's note correctly) to have given yourself unilaterally a sick leave for the semester!

I think that it would be best for all concerned (particularly you), if you came in here as soon as you receive this letter to thrash this matter out with me. In brief, I think I have reason to be suspicious of the incapacitating nature of your ailment in view of the history of the past semester, and the University backs me in insisting that you be examined by a second physician to determine your fitness for duty. It is quite possible, of course, that the second physician will concur

with the first, and in that case I can put you on the sick list until such time as you are again fit. I have twice had the ailment you claim to be suffering from. I might add that I don't really doubt that you *do* suffer from it! But I doubt that it is so severe that you cannot carry on with your job. Experts can tell.

If you do not consent to a second examination, however, and if the second physician should find the ailment less debilitating than originally announced, I would expect either that you return to your teaching duties or that I would as both a chairman and a taxpayer recommend to the Chancellor that your pay be withheld for the semester.

In the absence of any discussion, it seems only fair to tell you all this, and, to be sure that you get it, I'll send it by registered mail. I hope that it results in a lengthy visit from you either Monday or Tuesday morning (January 19 or 20). Monday would be preferable to me since I must complete preparations for classes by Wednesday.

Sincerely yours,

/s/ Travis Summersgill
Travis Summersgill
Chairman

Professor Summersgill remained Kay Austen's implacable enemy, giving her no quarter in her attempt to get out from under his heavy hand by exchange or sick leave, recommending her for termination, doing his (successful) best to defeat her workers' compensation claim for the original neck injury in April 1980, and even to the present time remaining unrepentant.

The flavor of his attitude may be gleaned from the obvious sarcasm in his letter of June 2, 1981, to Kay Austen (P96) in which he wrote:

You will recall that at the beginning of the past term I turned your case over to the Dean, and it may ease the pain in your neck for you to know that in any action I take (such as this letter), I am acting as his agent.

While most of the interaction that led to Kay Austen's temporary total disability was between her and Professor Travis Summersgill, the record is clear that the University of Hawaii administration closed ranks to support him against her.

Richard K. Seymour, Dean Designate and then Dean of the Faculty of Languages, Linguistics and Literature in the College of Arts and Sciences at the University of Hawaii at Manoa, was aware of Kay Austen's medical condition. (P105, P107). His contribution to her well-being was to request monthly reports from Dr. Dericks to be sent to Professor Summersgill "with a copy to me."

Regarding Kay Austen's attempt at an exchange, Professor Summersgill reported regularly to Dean Richard K. Seymour. (P89, P94). Dean Seymour affirmed Professor Summersgill's authority and approved of his actions. (P79, P93). Dean David E. Contois, Interim Provost and Dean, College of Arts and Sciences, was also involved. (P95, P97). Dr. Dericks was the doctor suggested by Professor Summersgill when he demanded that Kay Austen be examined by a doctor selected by the University. (P68).

Professor Summersgill had on January 18, 1981, notified "Chancellor Long's Office (ATT: MR. ROBERT PRAHLER)" with "Information Copies to: Dean/Provost David E. Contois (ATT: DEAN OLSEN)" and "Dean Designate Richard K. Seymour" that: "In the event of her non-compliance with my request to have an examination by a University-selected physician to determine the extent of her disability, she will have unilaterally taken a one-term leave. My letter to her explains the reasons why I doubt the incapacitating nature of her ailment. In my opinion, she is looking for a semester off with pay." He wrote: "... I wish to keep everyone from Chancellor Long to Dean Seymour aware of the problem. Knowing Kay as I do, I expect the whole matter to end up in a lawsuit." He had already sent copies of his January 17, 1981, letter, reproduced above, to the same persons. (P69).

Obviously it did not occur to any of these men that at least some of the fault for the situation should be attributed to Professor

Summersgill's attitudes and style of management.

Kay Austen met with Dean Seymour to complain about her mistreatment by Professor Summersgill. At Dean Seymour's suggestion, she wrote at length to Dean Seymour on January 26, 1981 (misdated 1980) giving him her "Chronology of harassment by Travis Summersgill—Confidential Memo." (P526). The record does not indicate whether her letter was disseminated further by Dean Seymour although he had said that he would discuss her concerns with Professor Summersgill. He did assist in arranging an exchange for Kay Austen (which eventually fell through) but does not appear to have taken her charges seriously. (P528).

Professor Summersgill and Dean Seymour had actual knowledge through reports from the doctor recommended by Professor Summersgill that Kay Austen could not return to work. Dr. Dericks' report of January 20, 1981, concluded: "I do not feel that she is able to work at her usual occupation at this time." (P104). Again on February 12, 1981: "Dr. Kay Austen continues to be totally incapacitated...." (P105). Again on March 10, 1981: "The patient is making gradual progress. Surgery might be indicated next month if her condition does not improve." (P108). Again on April 23, 1981: "The final decision for surgery has not been made yet." (P110). Again on May 21, 1981: "... Mrs. Austen is unable to return to work until further notice." (P111). Again on June 16, 1981: "The patient will be unable to return to work until further notice from the doctor." (P112). Again on August 4, 1981: "I feel that she is unable to return to work at this time, due to the nature of her occupation and the stress factor, and will not be able to return until after at least another two months of conservative treatment and observation." (P115).

Meanwhile, Kay Austen had filed claims for workers' compensation. The University is a self-insurer under the Workers' Compensation laws (as are all state agencies) and has its own claims and payments section. Her claims were "denied as injury is a recurrence of pre-existing non-work related injuries." (P289, P290). This action was taken in spite of the fact that the University had no medical opinion to support the basis for the denial. Kay Austen retained Peter Char to pursue her workers' compensation claims.

On August 11, 1981, attorney Shelby Anne Floyd wrote to Professor Summersgill to notify him that she represented Kay Austen "in the matter of her continued active employment by the University of Hawaii" and requesting that he "[p]lease address all inquiries or correspondence relating to her employment or sick leave to me." (P217). On August 14, 1981, Attorney Floyd wrote to Professor Summersgill "to inform you that Dr. Kay Austen is unable to return to her teaching duties at the University of Hawaii at this time." She stated that "Dr. Austen requests that she continue on sick leave with pay until her medical condition improves sufficiently so that she may teach again." (P218).

Incredibly, notwithstanding these reports and letters, Professor Summersgill submitted to Dean Seymour "[i]n accordance with our discussion of yesterday" a list of three staff members of the Department of English "who have not yet returned." The subject of his submittal was "Unauthorized absences." (P222). Dean Seymour on the same day sent Kay Austen by certified mail to her parents' address in Honolulu a letter (P221) which reads:

August 20, 1981
CERTIFIED MAIL

Professor Kay Austen
c/o MacIntyre
Apt. 602
1634 Ala Moana Blvd.
Honolulu, HI 96815
Dear Professor Austen:
This letter is being sent to you in care of the above address in accordance with your request of 4 August 1981.
Travis Summersgill has received and forwarded to me two letters from Shelby Anne Floyd who claims to represent you. The Department has no information from you to verify this claim nor authority to release information. Of course, even if

you had formally notified the University that Ms. Floyd is your agent, the University finds it unacceptable to conduct business with faculty members through an attorney in the absence of litigation. It is your obligation and responsibility to deal personally with your Department and the University.

You were expected to be on duty as of August 17, 1981, the beginning of the duty period for the 1981–82 academic year. This letter is to inform you that since you were not on duty as required you are considered to be on unauthorized leave of absence without pay effective August 17, 1981.

> Very truly yours,
> /s/ Richard K. Seymour
> Richard K. Seymour
> Dean Designate

> cc: David E. Contois, Interim Provost and Dean
>
> Travis Summersgill, Chairman, Department of English

Professor Summersgill could not resist his own snub of Attorney Floyd. By letter dated August 28, 1981, he told her: "The Department has received no information from Ms. Austen verifying that you represent her nor has she given us the authority to release information." (P225).

These two letters clearly indicate that Dean Seymour and Professor Summersgill had determined on a course of action designed to get rid of Kay Austen.[3]

On August 31, 1981, Professor Summersgill notified Dean Seymour under the subject heading of "Teachers Absent after August 17 without Official Leave" that: "Kay Austen has not yet reported in. She was scheduled to teach three sections today, but did not meet her classes." (P226).

On September 3, 1981, Kay Austen filed with Chancellor Durward Long a grievance pursuant to the agreement between the University of Hawaii and the University of Hawaii Professional Assembly protesting

being put on "unauthorized leave without pay status" (P227).

On September 18, 1981, Professor Summersgill recommended to Dean Seymour "that Dr. Kay Austen's employment with the University of Hawaii be terminated." (P228). His letter indicates the callousness with which he (and later his superiors in the chain of administrative command) completely disregarded the medical reports which the University had demanded. He wrote:

> Other faculty members, forced to stop teaching by illness, have maintained close contact with the Department of English, have assisted those substituting for them in the classroom with suggestions and advice, and have returned as early as possible to their duties. In contrast, Dr. Austen has demonstrated little or no professional sense of responsibility for her duties, and has simply walked away from them. Nearly all information concerning her has been siphoned to us through her lawyers, and, in the absence of litigation, an employee must, it seems to me, communicate with some regularity with her supervisor or, at very least, be available for such communication. At the present time I do not know where Dr. Austen is, nor do I have any indication that she feels any responsibility for the work which, originally assigned to her, is now being carried out by others. She has simply disappeared behind a facade of lawyers. Her unwillingness to communicate has become quite extraordinary. In the past year I have had only one face-to-face conference with Dr. Austen, and then only because the Dean insisted she see me. She has been a hard person to find, and now has disappeared altogether except insofar as her lawyers from time to time write about her.

> The recommendation for termination of employment, therefore, simply recognizes formally that Dr. Austen is no longer working for the University of Hawaii.

---

3. They both chose to ignore Kay Austen's letter of August 24, 1981, to Dean Seymour with a copy to Professor Summersgill verifying that Attorney Floyd "is my representative in any matter concerning the University of Hawaii and myself." (P223). Dean Seymour acknowledged having received that note. (P229).

On September 18, 1981, Dean Seymour wrote to Chancellor Durward Long: "On the basis of a memorandum from Professor Travis Summersgill, Chairman of the Department of English, and the supporting documents (copies enclosed) and on the basis of my own appraisal of the case I am hereby recommending to you that Professor Kay Austen be terminated." (P229).

On September 24, 1981, Chancellor Long passed on the recommendation for termination to Vice President Harold Masumoto. He requested "your office's assistance in assessing the contractual legal validity on the basis of this information provided in the attachments." (P231).

On October 20, 1981, Dean Contois notified Kay Austen that there was probable cause to discharge her because: "You failed to return to duty in the College of Arts and Sciences as of August 17, 1981 without obtaining official approval for leave as specified in the applicable provisions of the collective bargaining agreement and University procedures." (P236).

Shelby Floyd as Attorney for Kay Austen informed Dean Contois of Kay Austen's disagreement with his allegations and requested that the procedures provided for in the agreement be followed, including the appointment of a three-member committee selected from the Faculty Personnel Panel to "assist the Chancellor" (P237).

Howard P. McKaughan as Interim Vice Chancellor for Academic Affairs, on November 18, 1981, appointed Thomas Q. Gilson, Loretta Krause, and Joseph Maltby as the three-member committee. (P238). This committee was scheduled to meet with Vice Chancellor McKaughan the next day. Their advice was given orally. (P241). The general tenor of Thomas Q. Gilson's comments is set forth above.

On January 15, 1982, Vice Chancellor McKaughan wrote to Kay Austen: "After reviewing the record and discussing the matter thoroughly, I have concluded that I must agree with the action initiated by Dean David E. Contois in his letter to you of October 20, 1981. Therefore, since you failed to return to duty without obtaining official approval for leave, we must proceed to discharge you from your position as a University of Hawaii, Manoa faculty member." (P239).

Cynthia Winegar, President's Designee to consider the Grievances filed by Kay Austen, held hearings on each grievance and denied them all. (Deposition of Cynthia Winegar).

The grievances went to arbitration hearings in April 1982 before Ted T. Tsukiyama as arbitrator. On February 15, 1983, he decided (D279):

1. Employer's action placing her on unauthorized leave without pay effective August 17, 1981, was properly taken, and she would be on that status between August 17, 1981 and October 20, 1981.

2. Employer violated the union contract by not placing her on active pay status from the commencement of the disciplinary proceedings on October 20, 1981 through January 15, 1982, the date of termination.

3. Employer's action in terminating her on January 15, 1982 was without just and proper cause and in violation of the union contract. The discharge would be set aside and Kay Austen reinstated to active payroll status, subject to a suspension of three months without pay to be imposed for the first 90 days following the October 20, 1981 notice of probable cause.

4. Kay Austen was entitled to back pay from January 20, 1982 (less the three months penalty) to the date of his decision computed at applicable annual base salary rates, subject to standard contributions and deductions and subject to deduction of any workers' compensation payments she received during the back pay period.

5. She should not suffer any loss of seniority.

6. Her reinstatement to active payroll status would be subject to submittal of a report of her current medical and psychological condition and an application for clarification of her "sick leave" status.

By the time of the arbitrator's decision, the Director of the Disability Compensation Division had already decided on December 7, 1982, as set forth above, that Kay Aus-

ten was temporarily totally disabled for work as of January 1, 1981. (P297).

Predictably, the University had denied and opposed Kay Austen's workers' compensation claims through a contested hearing in the Department of Labor and Industrial Relations. The University's position that Kay Austen's claims were non-compensable was logically reasonable if there had been any medical evidence to support that position. However, the University stubbornly resisted liability even in the face of a contrary opinion from the University's own medical expert, not to mention the opinions of all of Kay Austen's treating physicians.

After the Director's decision finding compensability, the University engaged on a program of nit-picking medical claims which left Kay Austen often short of funds. She became despondent and even suicidal. The University denies trying to make it as difficult as possible for Kay Austen to receive the medical benefits to which she was entitled under the Director's decision, but the record is clear that the office in the University that handles workers' compensation claims seized on every possible technicality to deny or delay payments to her treating physicians and repayments to her. Dennis Chang, a Deputy Attorney General who had an early involvement in Kay Austen's workers' compensation claims, testified as follows regarding statements made to him by Evelyn Nowaki, an attorney at the University of Hawaii who was handling Kay Austen's workers' compensation file:

> I was told that ... that Mrs. Austen could be faking her claim and was running off with her husband someplace in Boston or on the West Coast—and in Virginia—I don't know the precise place—and that she was taking this and faking a Work Comp claim and the department wanted me to take a hard-line approach in the handling of the claim and would not pay any moneys if they could get around it.

(Transcript of Proceedings on December 18, 1990, Testimony of Dennis Chang page 2–135).

Dennis Chang did not want to proceed in that manner, so, with the approval of the attorney general, he returned the file to the University of Hawaii's in-house legal office.

This "hard-nosed" attitude on the part of the University was confirmed by Peter Char, the attorney who represented Kay Austen in her Workers' Compensation claims. He testified that his attempts to settle her claims met with an unyielding posture which was explained to him by Evelyn Nowaki as being because the University considered the Kay Austen case to involve "a matter of principle." (Testimony of Peter Char).

I find that Kay Austen has proved by the overwhelming weight of the credible evidence that she was subjected to harassment, retaliation, and discrimination by the University of Hawaii, at first by Travis Summersgill as Chairman of the Department of English but thereafter by his superiors who supported him and who participated in the actions taken against Kay Austen.

The foregoing recital of facts suggest several possible causes of action against several different defendants. Indeed, Kay Austen did file a complaint against several defendants and setting forth several causes of action. However, the only cause of action that remained for trial and with which the court is now concerned is her claim for relief pursuant to Section 703(b) of Title VII (42 U.S.C. § 2000e–2(b)) for unlawful discrimination on the basis of sex. The complaint also alleges retaliation which technically is prohibited by Section 704(a) of Title VII (42 U.S.C. § 2000e–3(a)).

Kay Austen was not just another *female member of the faculty of the English Department. She was an active promoter of women's rights. Her maiden name was Kay Kauffman. When she married her second husband and was recruited by the University of Hawaii she was Kay Lanier. When her husband joined the same English Department faculty, she changed her name to Kay Austen because: "I wanted to be known as my own person. I had four years seniority on him." And*

"Austen" because: "... I love the work of Jane Austen." (Transcript of Proceedings on December 18, 1990, page 2–93).

Early on she stood up to then Department Chairman Foster and his then Assistant Chairman Summersgill by refusing to serve in the Green Room Library. On February 2, 1976, Assistant Chairman Summersgill notified Dean Contois that, because one of Kay Lanier's classes had been canceled for failure to enroll enough students, they "endeavored to switch the reduction to an instructor approved by the Research Committee of the Department." He continued: "When we were unsuccessful in the attempt to switch, we did the next best thing, and made Ms. Lanier the Librarian of the Green Room Library for the semester. In this capacity she will have charge of the room during its open hours, will check the shelf list of books, and catalog new items. As an untenured instructor, she should not, we feel, have a load reduction at this time, and her activities as librarian will round out her work load." (P41).

"Ms. Lanier" refused to accept the assignment, much to the displeasure of both Chairman Foster and Assistant Chairman Summersgill who kept mentioning the incident in their evaluations of her. They both thought she should have been grateful for having been given this temporary sinecure which was supposed to be a great plum for someone who wanted free time to do something else. It apparently shocked them to discover that Kay Lanier considered the assignment demeaning. She had not been consulted beforehand. In spite of the Foster–Summersgill characterization of this assignment as a plum, none of the witnesses had ever served there, and nobody could think of anyone other than two men who had willingly served in the Green Room to help out the one woman who handled the library on a more or less permanent basis.

Professor Summersgill succeeded Professor Foster as chairman. Jane Fellmeth, who was at one time a teacher in the English Department, testified in deposition about Professor Foster as follows:

Q. What about Richard Foster, how would you characterize his tenure as department chair?

A. Terrible.

Q. Why?

A. He was impulsive, narrow-minded— this is my, understand, opinion of him.

Q. I understand.

A. Based on one semester working as assistant chair for him. He discriminated against women, I felt that—myself for one.

Q. How did he discriminate against you?

A. I was performing some duty or other, I can't remember exactly what it was now, that was part of my job, and for some reason or other, he disapproved of whatever it was I did, and so he told me that I reminded him of his grandmother, and I should layoff. So to me, that was—he was unique in that respect in the department, I felt. He was a respected scholar, however, I must say that about Richard Foster.

Q. Would you use the term "congenial" to describe him?

A. Not, no, I would not.

Q. How about collegial.

A. No, I wouldn't call him collegial either.

Q. How did you get involved working for this man?

A. Because I had been working for Joseph Maltby, you see, and we changed chairs and I was asked, please, to stay on and help this man get acclimated to Hawaii, he was imported from the East Coast somewhere, I've forgotten where, and to help him get oriented here at the university and in the department, and I said okay.

So I did that, and then by some miracle, I didn't even have to resign, by some miracle I was recruited to go to the chancellor's office. At that point—

Q. So you worked with him for only one semester?

A. That's correct.

Q. And did you find that he discriminated against other women?

A. I couldn't answer that question, I could not.

Q. Did you find that he had attitudinal difficulties with women teaching professionals?

A. I can't say that he did. I can only—if I generalized on my own experience with him, I'd say he had great attitudinal problems, but obviously I can't do that, because this was a personal experience that I had.

Q. So did you ever witness him interacting with other women in the department where he displayed bias?

A. No, I cannot say that I did.

Q. Did you ever hear of incidents from other people where Richard Foster was said to have exhibited bias or discriminatory views?

A. No, I cannot say that.

Q. Was he a good administrator?

A. No.

Q. Did he delegate a lot of his work?

A. My recollection of him is that he was very unorganized and he administered kind of off the top of his head, and that's about all I can say about Richard Foster, because I pretty well blocked him out.

The Green Room incident, an earlier conflict over a failing grade to a student, and his own observations as an administrator "for the past 1 1/2 years" were the grounds cited by Professor Summersgill for opposing Kay Austen's tenure application in December 1976. (P16). He raised the question: "Is she adaptable, is she collegial?"

These are troublesome adjectives with ambiguous overtones. Is he questioning her conduct based on his preconception of how a woman should react to male authority, or would he use the same adjectives in relation to a man in the same circumstances?

Kay Austen continuously pursued her activities on behalf of women in the Department of English. She was a primary mover in getting women in the department to meet regularly in each other's homes in order to form a more solid group to promote the interests of women.

The Honolulu Advertiser on October 16, 1978, carried an article by Advertiser University Writer Tom Kaser under the headlines "UH women faculty losing ground" and "Report: affirmative action not working" (P45).

The article reported that the University of Hawaii's Commission on the Status of Women had reported "a clear deterioration" in the status of women faculty at the Manoa campus between 1975 and 1977. Women collectively were no better off in 1977 than in 1975 and in fact in most categories were worse off. The University of Hawaii's Manoa campus had begun developing an affirmative action plan in 1973, the year after a group called the Ad Hoc Committee on the Status of Women had complained to federal authorities about discrimination against women in a number of areas at the Manoa campus. After a self-study, the University had identified 19 departments in which women were underused and formulated an affirmative action plan which was acceptable to the U.S. Office of Civil Rights. In the summer of 1977, the Manoa campus was declared in compliance with federal law relating to equal employment opportunity. Nevertheless, according to the report of the University of Hawaii's Commission on the Status of Women, women were worse off in 1977 than in 1975.

For some reason, Professor Summgersgill felt compelled to respond to the Kaser article. (P46). The letters section of the Honolulu Advertiser carried a letter from Travis Summersgill as Chairman, Department of English, UH, giving figures about applications and hirings in his department. His letter stated that "we are so evenly balanced in numbers that it would be almost impossible for a discriminatory pattern to be developed and maintained."

He concluded: "I don't know who the varmints are who are trying to keep women out of class and committee. But they haven't been successful in the university's largest single department." The choice of the epithet "varmints" seems to trivialize in Professor Summersgill's mind what was a serious and even emotional matter to the women involved.

One of the women who reacted negatively to Professor Summersgill's letter was Kay Austen. She prepared a chart showing by name what males and what females were in the several categories of assistant professor, associate professor, full professor, and instructor. (P48).

She also prepared a response to be sent to the Honolulu Advertiser for publication. (P49). The proposed letter took issue with Professor Summersgill's statistics and claims and stated that "the correct figures reveal a clear-cut pattern of discrimination which conforms to the nation-wide pattern in academia."

She prepared a memorandum to four other women in the department enclosing a copy of the Summersgill letter and of her chart and proposed response and asking them to sign her response along with her and another woman faculty member. (P47). She had concluded her proposed response: "For his part, Professor Summersgill blithely claims that he doesn't know the 'varmints' who are discriminating against women on this campus. Look around you, Professor Summersgill: they are your fellow faculty and administrators." In her memorandum she noted: "On page three at the bottom, I prefer 'flippantly' rather than 'blithely' because the jovial tone at that point in his letter implies that some paranoid fool has dreamed up these claims of discrimination. If 'flippantly' is a real problem for you, though, please so indicate and I will leave 'blithely'."

After first having spoken to the four other women faculty members, Kay Austen added as a postscript to her memorandum that one of them "had made the excellent suggestion that we give Travis the opportunity to correct his letter (publicly, of course)." She appended a proposed letter to Professor Summersgill asking him to "please consider writing another letter which includes the facts" set forth in her proposed letter to the newspaper. (P50).

There were further letters and memoranda prepared by Kay Austen. (P51, P52, P53). In any event, Kay Austen failed to get the requested signatures of her female colleagues. Her proposed letter was not sent. Professor Summersgill did not write another letter.

It is not clear how much of Kay Austen's activity and editorial effort became known to Professor Summersgill. He testified that he had not seen Kay Austen's proposed letter to the newspaper. Kay Austen was not sure that she had shown him the proposed public letter or the letter asking him to submit another letter to the newspaper but was sure she had given him one or the other if not both. Judging from Professor Summersgill's on-hands managing style, I conclude that he was aware at the time or very soon after this activity of all of the salient details of who was doing what.

At the same time as the foregoing, Professor Summersgill's term of three years as chairman of the department was about to end. The faculty members were about to take a straw poll as of December 8, 1978, on available candidates, the results of which would be reported to the dean who would make the appointment of the chairman for the next three years. Kay Austen had set about much earlier to try to get a woman chosen for the new term.

Kay Austen wrote to Professor Margaret Solomon on September 30, 1978, discussing the situation and inquiring about Professor Solomon's availability, philosophy of administration, and specific ideas about various issues. (P568). Kay Austen stated: "At the beginning of the semester, no one seemed willing to challenge Travis for the chairmanship, particularly in view. of his stated desire for reelection. Last week, however, Phyllis stepped forth and said that she very much wants to be chairman." And again: "The women are going to place both you and Phyllis in nomination so that both of you are sure to be among the top three contenders. There will probably be a brief interlude before the final ballot."

The ballots were counted on December 9, 1978. There were three candidates—Travis Summersgill, Margaret Solomon, and Phyllis Hoge. No one had a majority. Twelve eligible voters were away from Hawaii, so the Election Committee and the Search Committee decided to extend the

deadline to December 18, 1978, for receipt of ballots postmarked December 8, 1978. (P56). The result was still indecisive. A run-off vote was held between the top two candidates, Travis Summersgill and Margaret Solomon. Professor Summersgill received a majority of the votes cast and was in due course appointed chairman for another three-year term. Professor Solomon referred to his reappointment by saying "he wasn't ousted, in other words." (Transcript of Proceedings on January 4, 1991, Testimony of Margaret Solomon, page 15). For an allegedly routine, uneventful election, that was an unusual choice of words.

Professor Summersgill had named Kay Austen to chair the Election Committee. Professor Maltby chaired the Search Committee. When Professor Maltby notified the "Members of the Department" that the deadline would be extended to December 18, 1978 (P56), a following communication was sent "To the Department" dated December 13, 1978, over the signatures of candidates Phyllis Hoge and Travis Summersgill protesting that procedure (P57). That protest reads as follows:

Phyllis Hoge and Travis Summersgill, the two resident candidates for chairmanship of the Department, have informed Joe Maltby, Chairman of the Chairmanship Committee, that, in view of various departmental protests, we feel that procedure has been violated in the taking of the straw vote indicating departmental preferences. We agree in general with the argument that, once the votes have been counted, the elective process is at an end. If this were not so, the three people privy to the results would be in a peculiarly powerful position to jockey around for more votes. We are not for a moment suggesting that they would do this. But we want to be sure that no lingering doubts will remain in anyone's mind about the essential fairness of the preferential ballot. Phyllis and Travis feel that enough is enough, and neither wishes to protract this elective process to the point of diminishing respect or good feeling.

The two of us wish to make clear that we shall abide by the wishes of the Chairmanship Committee. But we would like to make clear our feeling that, whatever the vote may be, the straw vote should not be taken as a be-all and end-all. The Dean ends all.

Professor Summersgill's memory of that election and protest is not credible. He testified that he really wasn't too eager to be chairman again and denied campaigning for the position. Yet he most certainly did not withdraw in favor of either of the women candidates.

He professes not to have too clear a memory of the letter of protest, and proffered the remark that as it was double-spaced and he always typed his communications single-spaced the letter must have been typed by Phyllis Hoge, and he just went along at her request. However, the wording of the protest bears a definite Summersgill flavor, including a snide reference to the two "resident" candidates, and ending with a belittling suggestion that the vote by the faculty members was only advisory. He testified that the letter was prompted because there was a dispute between the Elections Committee and the Search Committee. Professor Maltby, chairman of the Search Committee, testified that these two committees operated in perfect harmony.

Kathleen Falvey, a member of the Elections Committee, resigned from that committee on December 11, 1978, because of the "furor" over the conduct of the election. She stated that: "I am still convinced that three honorable people should have been trusted to cope with an unreasonable timetable." She mentioned her upcoming consideration for tenure and wanted it known that "I dissociate myself from the swirl of controversy surrounding the election of the Chairman who will be intimately concerned with my tenure." She also stated: "My esteem for Kay [Austen] and Joe [Maltby] has grown." (P59 page 3).

Professor Summersgill testified that the election did not generate any ill-feelings. Professor Maltby wrote that "the Search Committee is meeting this week with the candidates to talk about ways to avoid in

the future the problems and ill-feelings that have proved so regrettably divisive." (P58).

Nobody came right out and accused Professor Summersgill as the instigator of the furor, although it seems unlikely that any woman member of the faculty would fear retaliation from either of the women candidates.

Professor Summersgill was on leave during the first half of 1979. Kay Austen was on sabbatical leave for one year, from September 1979 to September 1980. Thus there was no interaction between the two of them for over a year and a half. As soon as the 1980–81 school year began, Kay Austen again felt his heavy-handed authority.

She and her husband returned to duty late. The evidence suggests that Professor Summersgill had actual knowledge that they would be late. He chose to stand on the absence of pre-approved formal paperwork and recommended both for pay-docking which was done. (P60, P61, P62). Kay Austen and Sid Lanier wrote a joint letter to Professor Summersgill on September 26, 1980, expressing their regret for being late and denying any attempt at insubordination. (P63).

The record supports the conclusion that by now Kay Austen was trying to avoid Professor Summersgill while he proceeded to build up a negative file of her behavior. (P64, P66). The rest has been detailed at the beginning of these findings.

The evidence is overwhelming that Kay Austen engaged in activities protected under Title VII, in promoting women's rights in the Department of English at the University of Hawaii, and in filing a complaint with the EEOC.

■ There remains the question of whether the discrimination and retaliation to which Kay Austen has been subjected was sufficiently related to her protected activities to constitute a violation of Title VII. I find that it was.

Earlier I quoted defendants' expert, Dr. Enelow, who wrote on April 26, 1989, that "the evidence is clear that her chairman ... was angered by her Affirmative Action activities in attempting to better the working and pay conditions for faculty women...." I also noted that the EEOC had made a determination on September 3, 1983, that there was reasonable cause to believe that her charges of discrimination and retaliation were true.

Of course, neither of these statements relieves me of the duty of reviewing the evidence in accordance with applicable legal standards to determine whether Kay Austen has proved this connection by a fair preponderance of the credible evidence.

Defendants argued that the evidence taken in the light most favorable to Kay Austen only proves "a mutual visceral dislike and repulsion" between her and Professor Summersgill and the efforts by him "as a petty tyrant who made marked efforts to control her." (See D279).

Whatever Professor Summersgill did in relation to Kay Austen was fully supported and approved by his superiors all the way up the line of command of the administration of the University of Hawaii and with knowledge of her charges of discrimination and retaliation. As set forth above, the most serious discrimination and retaliation against Kay Austen would not have been possible without the actual participation of these officials. But was there a violation of Title VII?

Discriminatory intent may be inferred from the situation. Were men treated in the same way as was Kay Austen? No evidence was offered to support the proposition that Professor Summersgill treated every faculty member the same way.

Was the effort to get rid of Kay Austen accelerated by her attempt to get a woman appointed to chair the department? At the time of the December 1978 voting, no woman had ever chaired the department and none has been so appointed since. No one could even think of another occasion when a woman had been a candidate.

Did the University of Hawaii have any history of discrimination against women? I have set forth above the Kaser article on the report of the University of Hawaii's

Commission on the Status of Women which concluded among other things that women faculty members at Manoa "were collectively no better off in 1977 than they were in 1975" and, in fact, "in most categories they were worse off."

Professor Summersgill denies any discriminatory intent in relation to women. Yet his words and actions do not indicate a sensitivity to women's concerns. His reference to "varmints" was flippant.

In the handling of Kay Austen's attempted exchange, he demonstrated concern for Professor Friedman (who was keeping Kay Austen in uncertainty over his availability (P86)) and scorn of Kay Austen's problems (P83, P88, P89). He referred to her in ways which reasonable women consider to be typical of males who consider women inferior. For example:

"I've had a slipped disc twice in my life and didn't know it was good for a semester's sick leave; but either Kay has a highly wrought imagination or a slipped disc in the area of the neck is far more serious than one in the lower back." (P83).

"Kay is nothing if not precise: a regular clockwork creature, and if anyone can recover at the drop of a hat, I feel sure she can." (P83).

"Dick, before Kay has us all totally confused by changing her mind more often than once every five minutes, let me make some basic points...." (P89).

"I wish it [a three-way exchange] had worked out, because it had a logic about it which would have made it difficult for Kay to resist." (P98).

The perspective of a reasonable woman is justified because "a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women." See Ellison v. Brady, 924 F.2d 872 (9th Cir.1991). Would he have said these same things in the same way about a man?

It is also clear that the University of Hawaii was firm on having Kay Austen withdraw her EEOC charges. Peter Char,

her Workers' Compensation attorney, testified that he and attorneys for the University of Hawaii were within $5,000 of settling Kay Austen's money claims but that the University insisted that withdrawal of the EEOC charges and an agreement that she not return to the University were matters of principle that had to be part of any settlement.[4] Peter Char did not represent Kay Austen on her EEOC charges and therefore could not negotiate the University's requirements.

Kay Austen was employed by the University of Hawaii as an Assistant Professor in the Department of English beginning July 1, 1973. In the normal course of events, she would have been promoted to Associate Professor beginning July 1, 1982, and to full Professor beginning July 1, 1986. (Transcript of Proceedings on December 18, 1990, Testimony of Kay Austen page 2–87 et seq.).

Although she has been determined to be permanently totally disabled for the purposes of the benefits available under the Workers' Compensation laws of the State of Hawaii, it is not unreasonable to anticipate that she may in the future be able to earn a living at a rate of pay comparable to what she would have been earning at the University of Hawaii.

She has prayed for back pay at "the going maximum salary" for an Assistant Professor through the 1983 school year (to June 30, 1984) and at "the going maximum salary" for an Associate Professor from July 1, 1984, to the date of judgment herein, and front pay at "the going maximum salary" for an Associate Professor from and after the date of judgment herein, plus (as to both back pay and front pay) the amount payable for three (3) credits of teaching during each summer month, plus prejudgment interest.

I find that the evidence as to summer teaching credits is insufficient to support a particular number of credits, if any.

I find that the measure for back pay and front pay is not necessarily "the going maximum salary" but more appropriately

4. If there had been no violation of Title VII, why be concerned about her charges?

the salary that Kay Austen would have received in the past and would receive in the future if continuously employed in the Department of English. Back pay should include lost fringe benefits that would have accrued to Kay Austen, such as amounts payable to her retirement fund, medical benefits plan, and any other benefit program maintained by the University of Hawaii or State of Hawaii.

■ I find that Kay Austen is entitled to prejudgment interest on the unpaid amounts awarded as back pay, calculated at the prevailing rate of interest. She was essentially without an income from August 17, 1981, to January 12, 1983, and was maintained during this period largely through the generosity of others. There is no evidence that the University of Hawaii ever made any salary payments to Kay Austen for periods after August 17, 1981, notwithstanding the arbitrator's decision of February 15, 1983 (D279). A payment of $12,538.70 was made to Kay Austen by the University of Hawaii on January 12, 1983 (D243) which is stated to be "for temporary total disability (TTD) benefits for the period January 1, 1981 through December 31, 1982, minus the credit offset of $11,434.50."

■ Kay Austen challenges the right of the University of Hawaii to offset temporary total disability payments and permanent total disability payments against back pay. These disability payments, unlike medical benefits, are not fringe benefits in connection with her employment. They are payments made by the University of Hawaii as a percentage of her salary. Thus the employer may offset these disability payments against the back pay awarded to Kay Austen.

The medical evidence, as detailed above, supports the finding that the treatment to which Kay Austen was subjected at the University was responsible not only for her temporary total disability but also for her permanent total disability. She is therefore entitled to front pay for a reasonable period of time.

Kay Austen was born in 1944. She might be expected to work to age 65 or another eighteen years. She would be eligible to retire at age 55 or another eight years. On balance, I find that it is fair and reasonable to award her front pay for another ten years or until she assumes a comparable teaching position at an accredited university or is earning a living at a comparable salary, whichever is sooner.

I find that the arbitrator's decision of February 15, 1983 (D279) was moot when rendered because Kay Austen had already been declared on December 7, 1982 to be temporarily totally disabled as of January 1, 1981 (P297), and that total disability has continued to this day (P457). Thus the arbitrator's decision that the action by the University of Hawaii on unauthorized leave without pay effective August 17, 1981, and until October 20, 1981, and the arbitrator's decision imposing a penalty of three months' suspension without pay from October 20, 1981, to January 20, 1982, cannot stand.

■ Plaintiff prays for a permanent injunction "enjoining Defendants from engaging in any and all acts of gender discrimination against Plaintiff and other faculty members and students of the University of Hawaii and employees of the State of Hawaii, and specifically enjoining Defendants from further impeding, restricting or otherwise limiting Plaintiff's benefits and other entitlements accruing to her by reason of her employment." The pleadings and evidence do not support or justify any injunction in these terms.

## CONCLUSIONS OF LAW

Kay Austen was subjected by the University of Hawaii to discrimination on the basis of her sex and to retaliation for having engaged in activities protected by Title VII.

The remedies available to Kay Austen under Title VII include back pay, front pay, prejudgment interest, and attorneys' fees and costs.

She is entitled to back pay from August 17, 1981, to the date of the judgment herein, calculated as set forth hereinabove, less

amounts received as temporary total disability and permanent total disability.

She is entitled to prejudgment interest at the prevailing rate of interest.

She is entitled to front pay from the date of the judgment herein for a period of ten (10) years or until such time as she assumes a comparable teaching position at an accredited university or is earning a living at a comparable rate of pay, whichever is sooner, at the salary she would have received as a full Professor if continuously employed in the Department of English, payable annually in a lump sum on July 1st of each year.

The decision of the arbitrator of February 15, 1983 (D279) is superseded by this decision.

Kay Austen is awarded her attorneys' fees and costs herein.

The parties shall submit within thirty (30) days calculations based on the foregoing and the evidence adduced in order to reduce the general awards to specific sums of money.